## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| Securities and Exchange Commission,<br><br>         Plaintiff,<br>  vs.<br><br>Aras Investment Business Group S.A.P.I. de C.V., Armando Gutierrez Rosas, Maria de Lourdes Tolentino Roque, Diayanira Rendon Trejo, Efren Norberto Quiroz Gardea and Luis Ricardo Quiroz Gardea,<br><br>        Defendants. | Case No. 3:23-cv-353 |

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows against Defendants Aras Investment Business Group S.A.P.I. de C.V. ("Aras"), Armando Gutierrez Rosas ("Gutierrez"), Maria de Lourdes Tolentino Roque ("Tolentino"), Diayanira Rendon Trejo ("Rendon"), and Efren Norberto Quiroz Gardea and Luis Ricardo Quiroz Gardea (together, the "Quiroz Brothers") (collectively, "Defendants"):

### I.     SUMMARY

1.     This case concerns a multi-million-dollar Ponzi scheme, affinity fraud, and unregistered offering of securities conducted in the U.S. from about March 2020 through November 2021 by Gutierrez using his Mexican-based company Aras and its U.S.-based affiliate, Aras Business Group LLC (the "LLC").  Gutierrez, through Aras and the LLC, solicited at least 450 U.S.-based investors in several states, most of whom were native Spanish speakers within the Mexican American community, to invest about $15 million, while misrepresenting that their funds would be used to invest in real estate and Mexican mining operations.  Gutierrez

hired Tolentino as a nominee to open and run the LLC and its bank accounts in the U.S. and approved her hiring of Rendon as its bookkeeper.  Together, Tolentino and Rendon managed about $14.5 million of U.S. investor funds in the LLC's U.S.-based bank accounts.  Gutierrez also used the Quiroz Brothers as promoters to solicit U.S. investors, supervise members of Aras' sales force, and manage about $500,000 of investor funds in their own personal bank accounts in the U.S.  Tolentino, Rendon and the Quiroz Brothers (together, the "Individuals") used the LLC's and the Quiroz Brothers' U.S.-based bank accounts to make about $9 million in Ponzi payments to investors and to send money to and buy expensive items for Gutierrez and Aras.  U.S. investors lost more than $6 million during the period.

2.      Working under the name of Aras and/or the LLC, Gutierrez, Aras, Tolentino and the Quiroz Brothers (together, the "Offering Defendants") directly or indirectly offered and sold to U.S. investors investment contracts purporting to provide investors the opportunity to buy "shares" in Aras and/or to invest in purported Aras "portfolios."  Gutierrez and Aras, directly and through the Quiroz Brothers and other promoters, and through websites and documents, represented to investors, both orally and in writing, that their money would be invested in real estate and a Mexican mine owned by Aras, which would generate returns on their investments.  They promised investors returns that ranged from 4.5% to 10% monthly depending on when they invested, the amount invested, and the length of the contract.  They also claimed that these investments were "secure investment funds with minimal risk."  All these claims were false.

3.      Contrary to these claims, no U.S. investor funds were used for investment purposes, and the investments were anything but "safe."  Instead, Gutierrez directed the Individuals to pay investors their returns, in Ponzi-like fashion, from money deposited by later investors.  He also, directly and indirectly, ordered them to send him investor money and buy him expensive items, including a $50,000 engagement ring, from investor funds.

4.    The Individuals aided and abetted Gutierrez' and Aras' securities fraud, and the Offering Defendants engaged in the unregistered offering and sale of securities by, among other things, soliciting investors, collecting investor deposits, sending investors returns in the form of Ponzi payments, and sending Gutierrez and Aras investor money and/or property bought with investor funds.  The Individuals also used investor funds to pay for their own personal expenses.

5.    No registration statement was in effect for the investment contracts and/or shares sold by the Offering Defendants.  In addition, there was no exemption from registration.  The Offering Defendants' offerings and sales of unregistered securities therefore violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)].

6.    By directly or indirectly making materially false statements to investors in connection with offering and selling investment contracts to investors, and by engaging in deceptive acts in connection with the offer, purchase, and sale of these investment contracts, and by thereby obtaining money or property, Gutierrez and Aras violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5].

7.    As the Chief Executive Officer and owner of Aras and mastermind of the fraudulent scheme, Gutierrez did not act in good faith and is likewise jointly and severally liable as a control person for the securities violations committed by and through Aras, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t].

8.    Tolentino engaged in the unregistered offering and sale of securities and aided and abetted Gutierrez' and Aras' securities fraud violations by, among other things, incorporating and managing the LLC, overseeing the LLC's business expenses and managing bank accounts through which investor funds were received and misappropriated.

9.      Rendon aided and abetted Gutierrez' and Aras' securities fraud violations by, among other things, acting as bookkeeper for the LLC, paying investor returns, promoter commissions and LLC employee salaries, and managing the LLC's business expenses and bank accounts through which investor funds were received and misappropriated.

10.     Efren Norberto Quiroz Gardea engaged in the unregistered offering and sale of securities and aided and abetted Gutierrez' and Aras' securities fraud violations by, among other things, soliciting U.S. investors, managing a sales force that solicited U.S. investors, and managing personal bank accounts through which investor funds were received and misappropriated.  He was not registered as a broker-dealer, as is required for those offering securities to investors as he did here.  He therefore also directly violated Exchange Act Section 15(a) [15 U.S.C. § 78o(a)] by acting as an unregistered broker-dealer.

11.     Luis Ricardo Quiroz Gardea engaged in the unregistered offering and sale of securities and aided and abetted Gutierrez' and Aras' securities fraud violations by, among other things, soliciting U.S. investors, managing a sales force that solicited U.S. investors, and managing personal bank accounts through which investor funds were received and misappropriated.  He was not registered as a broker-dealer, as is required for those offering securities to investors as he did here.  He therefore also directly violated Exchange Act Section 15(a) [15 U.S.C. § 78o(a)] by acting as an unregistered broker-dealer.

## II.      JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78(e) and 78aa] because Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means or instruments of

transportation or communication in interstate commerce, in connection with the acts, practices, and courses of business set forth in this Complaint.

13.     Venue lies in this Court pursuant to 15 U.S.C. §§ 77v(a) and 78aa, and 28 U.S.C. § 1391(b)(2) because certain of the transactions, acts, practices and courses of business alleged in this Complaint, including, but not limited to, the offers and sales of securities, took place in this judicial district.

### III.     DEFENDANTS

14.     **Aras Investment Business Group S.A.P.I. de C.V.** is an entity that, according to its website, was organized in Chihuahua, Mexico in 2015.  It was controlled by Gutierrez and is not registered with the Commission.  Aras' purported business model was to sell investment contracts to investors to invest in Mexican real estate (by buying distressed real estate and "flipping" it for a profit) and Mexican mining operations.  Aras purportedly owned a mine in Mexico and purportedly sold precious metals from its operations.  Aras had a large media and social media presence in Mexico and purportedly took in money from thousands of Mexican investors.  In Fall of 2021, Aras stopped paying its investors, and the Mexican government began enforcement proceedings.  Press reports from Mexico have alleged that Aras is a Ponzi scheme.

15.     **Armando Gutierrez Rosas**, age 37, is a Mexican citizen and former resident of Chihuahua, Mexico.  His was a founding member and the Chief Executive Officer ("CEO") of Aras.  At all times relevant to the complaint, he controlled Aras and controlled the LLC through Tolentino.  Around the time the Mexican government began enforcement proceedings against Aras, Guitierrez disappeared.  His current whereabouts are unknown.

16.     **Maria de Lourdes Tolentino Roque**, age 54 is a Mexican citizen and resident of Cordoba, Tennessee.  She was the nominal owner of the LLC.  She is not registered with the Commission.

17.     **Diayanira Rendon Trejo**, age 48, is a Mexican citizen and resident of Cordoba, Tennessee.  She was the bookkeeper of the LLC.  She is not registered with the Commission.

18.     **Efren Norberto Quiroz Gardea**, age 33, is a Mexican citizen and resident of Vineyard, Utah.  He was a promotor for Aras.  He is not registered with the Commission.

19.     **Luis Ricardo Quiroz Gardea**, age 32 is a Mexican citizen and resident of Vineyard, Utah.  He was a promotor for Aras.  He is not registered with the Commission.

## IV.     OTHER ENTITTIES

20.     **Aras Business Group LLC** is incorporated in Tennessee with its principal place of business at 5100 Poplar Avenue, Memphis, Tennessee.  It was nominally owned by Tolentino and her husband but was substantially controlled by Aras and Gutierrez through Tolentino.  In April 2022 it filed for bankruptcy, is in liquidation, and is currently controlled by a bankruptcy trustee who has control of its assets and plans to disburse them to harmed investors.  It is not registered with the Commission.

## V.     FACTS

### A.     IN EARLY 2020, GUTIERREZ EXPANDED ARAS' OPERATIONS IN TO THE UNITED STATES

21.     In or around January of 2020, Gutierrez engaged Defendant Efren Norberto Quiroz Gardea to solicit U.S.-based investors for Aras and use his personal U.S. bank account to receive investor funds.  Efren's brother, Defendant Ricardo Luis Quiroz Gardea, joined the operation in or around April of that year, similarly soliciting investors and using one of his personal U.S. bank accounts to receive investor funds.  Shortly thereafter, Efren added Luis as a signatory on his personal bank account.

22.     In approximately March 2020, Gutierrez hired Defendant Tolentino, whose son was a friend of Gutierrez, to incorporate the LLC in Tennessee, rent an office in Memphis, and

open and manage U.S. bank accounts for it.  Gutierrez also approved the hiring of Tolentino's

friend, Defendant Rendon, to be the LLC's bookkeeper.  While Tolentino and her husband were

the nominal owners of the LLC, the husband had no executive responsibilities, and Tolentino

took direction from Gutierrez and his assistants at Aras in Mexico.

**B.  DEFENDANTS OFFERED AND SOLD UNREGISTERED SECURITIES, ENGAGED IN A FRAUDULENT SCHEME AND PROVIDED MATERIALLY FALSE INFORMATION TO HUNDREDS OF PROSPECTIVE INVESTORS AROUND THE UNITED STATES**

23.     Beginning no later than March 2020, the Offering Defendants offered and sold

securities in the form of investment contracts to at least 450 investors located around the United

States.  Investors were located in, among other states, Texas, Arizona, California, Colorado,

Connecticut, New Mexico and Tennessee.  Most investors were native Spanish speakers.

24.     No registration statement was ever filed with the Commission or in effect for any

of these investment contract offerings or sales and no exemption from registration applied.  The

offering involved a general solicitation of investors and was made to investors throughout the

United States.  The Offering Defendants took no steps to verify investors' accredited investor

status.

25.     Aras and Gutierrez, through the Quiroz Brothers and/or one of several sales

representatives working in conjunction with them and at their direction, provided prospective

investors in the U.S. with offering documents, by email and in person, describing Aras and the

investment opportunity in their investment contract offering.  The Quiroz Brothers and other

Aras sales team members also communicated with investors by text message and orally in person

and over the phone and repeated the information in the offering documents.

26.     The offering documents that the Offering Defendants provided to prospective

investors were written by a combination of Gutierrez and/or other employees of Aras acting with

his knowledge and at his direction.  As CEO of Aras, Gutierrez had ultimate authority over the statements made in the offering documents.  The offering documents described Aras as "offering secure investment funds with minimal risk."  They described Aras as having purported "investment funds" or portfolios that invested in gold and in real estate, and offered investors returns of up to 10% monthly, depending on how much the investor contributed.

27.     Aras also created websites in Spanish and English that described the offering during at least the 2020-2021 period.  As CEO of Aras, Gutierrez had ultimate authority over the statements made on the websites.  Aras, through the Quiroz Brothers and other sales agents, directed prospective investors to review the information on the websites before they invested. Aras' website in English listed the LLC's Tennessee address and described Aras as "a company dedicated to the placement and positioning of capital in diversified portfolios within the real estate and mining sectors."  It advertised the investment opportunity as a "safe, reliable and highly profitable option" with the company offering "reliable and low-risk financial instruments."  It also stated that, regarding investor profits, "the interest rate is guaranteed for the life of the contract."  The website claimed that Aras invested investors' capital in minerals – mainly gold and silver – which it would sell to producers, and that it would purchase homes through bank auctions that it would remodel and put up for sale.  The website explained that investors would sign a contract where the terms, monthly return payments (called dividends) and initial capital were all indicated.  It further explained that, at the end of the contract, the initial capital and accumulated interest would be returned to the investor, who could decide if he or she wants to renew the contract.

28.     To help create a sense of urgency, Aras posted promotions on the internet, including Facebook, advertising higher returns to investors who invested by a set deadline. Aras' promoters, who were called "consultants" and included the Quiroz Brothers, directed

prospective investors to these promotions and sometimes sent promotions to prospective investors by text message. Some investors became consultants because Aras, through the consultants, told them that they would earn commissions for bringing in more investors. In addition, consultants were told that they needed to invest in Aras and that they needed to continue to bring in investors to avoid termination. Consultants therefore solicited many of their friends and relatives to invest. The consultants were given scripts of what to say to prospective investors, which typically regurgitated the statements in the offering documents as to the business opportunity and how investor funds would be used. Prospective investors, receiving this information and told by their consultant friends and family members that they were receiving their investment returns, decided to invest.

29.     Once a prospective investor decided to invest, consultants, including the Quiroz Brothers, provided them with wire instructions and/or bank deposit slips to make their investment payments. These instructions and deposit slips were for bank accounts in the name of the LLC or one or more of the Quiroz Brothers and were located in the United States. Investors were required to send a screen shot of their wire receipt or deposit receipt to the consultant, who provided it to Aras and/or the LLC.

30.     Aras employees then created contracts with the investors that provided for monthly "dividend" payments and/or a single payment at the end of the contract. The contracts, which sometimes were in English and sometimes in Spanish, were either between the investor and Aras or between the investor and the LLC. Either Tolentino or Gutierrez were named as the representative of the LCC for contractual purposes, and electronic copies of their signatures were added to those contracts. For those contracts between the investor and Aras, Gutierrez was named the representative of Aras, and an electronic copy of his signature was added to those contracts. Contracts between the investor and Aras generally described that the investor was

acquiring "shares" in Aras and claimed that the investor would become a shareholder in the company, with Aras to generate profits according to the "business portfolios" it managed. Contracts with the LLC generally provided that the LLC would "position [the investment] in the real estate and precious metal businesses, generating profitability for the CLIENT."  The contracts provided for returns to the investor to be paid either monthly or at the end of the contract.

31.     Gutierrez' and Aras' representations that Aras' investments were a "safe, reliable and highly profitable option" of "reliable and low-risk financial instruments," as well as representations that investor money would be invested in real estate and mining operations or in portfolios, were important to investors as they caused them to believe they were dealing with a successful, sophisticated company capable of managing their investments and providing profitable and safe investment returns.

32.     The representations in the offering materials, websites and contracts - and the regurgitations of those representations by consultants - that investors' money was safe and that Aras invested investors' money in real estate and Mexican mining operations or in "portfolios" were false:  Defendants did not use investors' money as described.  Instead, Gutierrez directed the Individuals to use U.S. investors' money in the LLC's and Quiroz Brothers' U.S. bank accounts to make Ponzi-like payments to other U.S. investors, to make purchases for and send money to Gutierrez and Aras, and to pay the Individuals' personal salaries and expenses.

33.     The LLC, through Tolentino or Rendon, collected about $14.5 million from U.S. investors and made about $8.1 million in Ponzi payments to them, while the Quiroz Brothers took in about $520,000 from U.S. investors and made about $360,000 in Ponzi payments to investors.  None of the investor money deposited with the LLC or the Quiroz Brothers was used for investment purposes.  None of the money investors received was generated from Mexican

mining operations or from real estate investments or sales.  All the money investors were paid was generated by deposits from other investors.

34.     In addition, Gutierrez and/or Aras employees operating at his direction, ordered Tolentino and Rendon to use investor funds from the LLC's and/or Tolentino's personal bank accounts to purchase a mansion in Aras' name for his use in Prosper, Texas for $2.5 million, send $300,000 to a foreign financial account, buy and deliver to him a $50,000 Harry Winston engagement ring, and order over $34,000 in merchandise for him from Amazon, Hermes, Hugo Boss, Luis Vuitton, Tom Ford and other websites.  Tolentino and Rendon made these purchases and, at Aras' and Gutierrez' direction, also paid over $150,000 in commissions to consultants, bought over $60,000 in computers and other equipment for Aras and/or Gutierrez, and paid out payroll for the LLC employees.  Gutierrez similarly requested that the Quiroz Brothers use investor money from their personal bank accounts to purchase personal items for him and/or Aras at B&H Photo, eBay and Amazon including household and vacation items, which they did.

35.     The Individuals, with Gutierrez' knowledge and consent, used investor funds to pay their own salaries and for their own personal expenses, as explained further below.

36.     Gutierrez directed the Individuals to provide him and Aras personnel with the LLC's and Quiroz Brothers' bank statements, which they did.  Gutierrez and Aras were therefore aware of the transactions in the bank accounts.

37.     Gutierrez and Aras (through Gutierrez) knew or were reckless in not knowing that they were operating a Ponzi scheme because they knew that they had represented to investors that their money would be used to invest in real estate and mining operations, but Gutierrez ordered the Individuals to use investor money for Ponzi payments and to enrich Defendants instead.  In addition, Gutierrez and Aras received the Quiroz Brothers' and LLC's bank statements which showed the transactions in their bank accounts, including the misappropriations

and Ponzi payments.  The fact that Gutierrez went into hiding when the fraud was uncovered in

2021 also shows his scienter.

**C.      THE INDIVIDUALS AIDED AND ABETTED GUTIERREZ' AND ARAS'
         FRAUD, AND TOLENTINO AND THE QUIROZ BROTHERS DIRECTLY
         VIOLATED THE SECURITIES OFFERING REGISTRATION PROVISIONS**

     **1. Defendant Tolentino**

38.      Defendant Tolentino was a necessary participant and substantial factor in

Defendants' unregistered offer and sale of securities and rendered substantial assistance to the

fraudulent scheme in at least the following ways.  In April 2020, Tolentino incorporated the LLC

in Tennessee.  Over the next approximately 18 months, she opened four bank accounts, over

which she had signatory authority, for the LLC.  She hired Rendon and several office employees

for the LLC and managed the office in Tennessee.  With Rendon's assistance, Tolentino

managed all the LLC's bank accounts.  She programed transfers and made check payments and

wires to investors.  She also paid overhead, commissions to the consultants and salaries to herself

and other employees of the LLC.  She also entered into transactions on behalf of the LLC and

was named as the representative for the LLC in contracts with investors.

39.      Tolentino knew or was reckless in not knowing that she was supporting a

securities fraud.  She received account statements for and used the internet to log into the LLC's

bank accounts and was aware of the activity in those bank accounts.  When he solicited her to

open the business on or before April 2020, Gutierrez told Tolentino that the business model was

to invest investors' money in real estate and Mexican mining operations.  However, after the first

LLC bank account began accepting money in June 2020, Gutierrez told her to use the investor

money to pay other investors and began demanding that she make purchases for him and Aras

using investor money.  She also knew that at least two of the LLC's bank accounts were frozen

and/or closed by the banks during the period, but she opened new accounts for the LLC at other

banks and continued to accept investor money, pay investors, and buy items for Gutierrez.  She also used her personal bank account to take in investor money, purchase items for Rosas and/or Aras, and send payments to investors, including when the LLC's accounts were closed or frozen. She personally delivered to Gutierrez' house in Mexico a $50,000 engagement ring that she bought at his direction in October 2020, using investor funds transferred from the LLC.  By at least February 2021, she had doubts as to the business model and how Aras was generating returns.  Despite this, she continued until at least October 2021 to accept money from investors, make payments to investors using money of other investors, and buying Gutierrez luxury items and sending him money.

### 2.     Defendant Rendon

40.     Defendant Rendon rendered substantial assistance to the fraudulent scheme in at least the following ways.  She worked as the LLC's bookkeeper, helping manage the accounting for the LLC's books and records, and as an office assistant.  She kept track of the investors' contracts and the money that was owed them.  She was in charge of the calendar for paying investors and managed the LLC's books, categorizing the LLC's payments or expenses.  She had internet access to the main LLC bank accounts and was responsible for programming the payments to investors in accordance with their contracts.  She programmed monthly payments to investors and made check payments and wires to investors, all derived from money contributed by other investors.  She also paid commissions to consultants, paid LLC employee salaries, and purchased items for Gutierrez and/or Aras using investor funds.

41.     Rendon knew or was reckless in not knowing that she was supporting a securities fraud.  She used the internet to log into the LLC's bank accounts and was aware of the activity in those accounts.  She was aware that she was paying investors with money from other investors, and that investors were not being paid from proceeds of real estate or mining activity.  When

Tolentino hired her to be the LLC's bookkeeper in May of 2020, Tolentino told her that the business model was to invest investors' money in real estate.  However, after the first LLC bank account began accepting money in June 2020, she followed Gutierrez' instructions to pay investors using money from other investors.  She also knew that at least two of the LLC's bank accounts were frozen and/or closed by the banks during the period, but she continued to pay investors and buy items for Gutierrez and/or Aras.

### 3.     Defendant Efren Norberto Quiroz Gardea

42.     Defendant Efren Norberto Quiroz Gardea was a necessary participant and substantial factor in Defendants' unregistered offer and sale of securities and rendered substantial assistance to the fraudulent scheme in at least the following ways.  He solicited investors as a consultant and managed other consultants who solicited investors.  He allowed Gutierrez and Aras to use the personal bank account that he shared with his brother Luis and managed that account for Gutierrez and Aras.  He made payments to investors using money deposited by other investors and bought Gutierrez and Aras luxury and other items using investor funds.

43.     Efren Norberto Quiroz Gardea knew or was reckless in not knowing that he was supporting a securities fraud.  He knew that Aras and the LLC were offering investment contracts to investors.  He had access to his and his brother Luis' personal bank account and was aware of the activity in that account.  He was aware that he and his brother were paying investors with money from other investors, and that investors were not being paid from proceeds of real estate or mining activity.  When Gutierrez first solicited him as an investor, and when he later hired him to be a consultant, Gutierrez told him that the business model was to invest investors' money in real estate and mining operations.  However, after his bank account began accepting investor money in March 2020, he followed Gutierrez instructions to pay investors and buy items for Gutierrez and Aras using money from other investors.

**4.     Defendant Luis Ricardo Quiroz Gardea**

44.     Defendant Luis Ricardo Quiroz Gardea was a necessary participant and substantial factor in Defendants' unregistered offer and sale of securities and rendered substantial assistance to the fraudulent scheme in at least the following ways.  He solicited investors as a consultant and managed other consultants who solicited investors.  He allowed Gutierrez and Aras to use a personal bank account he shared with his father and another bank account he shared with Efren and managed those accounts for them.  He made payments to investors using money deposited by other investors and bought Gutierrez and Aras luxury and other items using investor funds.

45.     Luis Ricardo Quiroz Gardea knew or was reckless in not knowing that he was supporting a securities fraud.  He knew that Aras and the LLC were offering investment contracts to investors.  He had access to his bank account and his joint bank account with Efren and was aware of the activity in those bank accounts.  He was aware that he and his brother were paying investors with money from other investors, and that investors were not being paid from proceeds of real estate or mining activity.  When Gutierrez first hired him in April 2020 to help manage his and his brother Efren's personal bank accounts, Gutierrez told him that the business model was to invest investors' money in real estate and mining operations.  However, after the bank accounts began accepting investor money, he followed Gutierrez' instructions to pay investors and buy items for Gutierrez and Aras using money from other investors.

**D.     DEFENDANTS PROFITED FROM THE SCHEME WHILE AT LEAST 450
         INVESTORS LOST $6 MILLION**

46.     Although U.S. investors lost about $6 million in the scheme, Defendants profited handsomely.  Gutierrez and Aras received approximately $400,000 in cash and items purchased by the Individuals.  Tolentino received a total of about $1.3 million in cash and money paid for

her benefit, including about $160,000 to buy her house and about $80,000 in auto payments. Rendon received about $188,000.  The Quiroz Brothers together received a net amount of about $93,000 in their bank accounts.  In addition, Efren Quiroz received about $150,000 in commissions and Luis Quiroz received about $15,000 in commissions. All these payments to Defendants were made from investors' funds.

## VI.     CLAIMS FOR RELIEF

### CLAIM ONE
### Violation of Section 5(a) and (c) of the Securities Act
### [15 U.S.C. § 77(a) and (c)]
### (Against the Offering Defendants)

47.     Paragraphs 1 through 46 are re-alleged and incorporated by reference.

48.     Section 5(a) of the Securities Act provides that unless a registration statement is in effect as to a security, it shall be unlawful any person, directly or directly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

49.     Section 5(c) of the Securities Act provides that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

50.     No registration statement had been filed or was in effect for any of the investment contract securities offered and sold by Defendants and no exemption applied.

51.     The Offering Defendants, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to sell such investment contract securities.  By reason of the foregoing, they directly violated, and unless restrained and enjoined, will continue to violate, Section 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

### CLAIM TWO
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
### (Against Aras and Gutierrez)

52.     Paragraphs 1 through 46 are re-alleged and incorporated by reference.

53.     Section 10(b) of the Exchange Act provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

54.     Rule 10b-5 provide that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

55.     Through the conduct described above, Aras and Gutierrez violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**CLAIM THREE**
**Aiding and Abetting**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Against the Individuals)**

56.     Paragraphs 1 through 46 are re-alleged and incorporated by reference.

57.     Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t], the Individuals, who through the conduct described above aided and abetted Gutierrez' and Aras' violations, are deemed to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as Gutierrez and Aras and, unless enjoined, will again aid and abet violations of those provisions.

**CLAIM FOUR**
**Violations of Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**
**(Against Aras and Gutierrez)**

58.     Paragraphs 1 through 46 are re-alleged and incorporated by reference.

59.     Section 17(a) of the Securities Act provides that it shall be unlawful for any person in the offer in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, directly or indirectly (1) to employ any device, scheme or artifice to defraud, (2) to obtain money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the

statements made, in light of the circumstances under which they were made, not misleading, or (3) to engage in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

60. Through the conduct described above, Aras and Gutierrez violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and unless enjoined will again violate that provision.

## CLAIM FIVE
### Aiding and Abetting
### Violations of Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]
### (Against the Individuals)

61. Paragraphs 1 through 46 are re-alleged and incorporated by reference.

62. Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], the Individuals, who through the conduct described above aided and abetted Gutierrez' and Aras' violations, are deemed to be in violation of Section 17(a) of the Securities Act to the same extent as Aras and Gutierrez and, unless enjoined, will again aid and abet violations of that provision.

## CLAIM SIX
### Violations of Section 15(a) of the Exchange Act
### [15 U.S.C. § 78o(a)]
### (Against the Quiroz Brothers)

63. Paragraphs 1 through 46 are re-alleged and incorporated by reference.

64. Defendants Efreen Norberto Quiroz Gardea and Luis Ricardo Quiroz Gardea, while acting as brokers or dealers, made use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any securities in the form of purchase agreements, promissory notes, or similar agreements without being registered with the Commission as a broker or dealer or an associated person of a registered broker-dealer.

65.     By reason of the foregoing, Defendants Efreen Norberto Quiroz Gardea and Luis Ricardo Quiroz Gardea violated and, unless restrained and enjoined, will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

**CLAIM SEVEN**
**Control Person Liability Under Section 20(a) of the Exchange Act**
**[15 U.S.C. § 78t(a)]**
**(Against Gutierrez)**

66.     Paragraphs 1 through 46 are re-alleged and incorporated by reference.

67.     Section 20(a) of the Exchange Act provides that every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

68.     As alleged above, Gutierrez was the owner and Chief Executive Officer of Aras. He controlled Aras and controlled the LLC through Tolentino and at no point in time acted in good faith.

69.     As alleged above, Aras violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

70.     Accordingly, Gutierrez is liable as a controlling person for the Exchange Act violations committed by the Aras pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

## VII.    PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final

Judgment:

1.      Finding that Defendants committed the securities law violations alleged in this

Complaint;

2.      Permanently enjoining the Offering Defendants from violating, directly or

indirectly, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77(a) and (c)];

3.      Permanently enjoining all Defendants from violating, directly or indirectly,

Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

4.      Permanently enjoining the Quiroz Brothers from violating, directly or indirectly,

Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

5.      Permanently enjoining Defendants from participating directly or indirectly,

including through any entity owned or controlled by them, in the issuance, purchase, offer, or

sale of any security; provided, however, that such injunction shall not prevent them from

purchasing or selling securities listed on a national securities exchange for their own personal

account;

6.      Ordering that each of the Defendants disgorge any and all ill-gotten gains,

together with pre-judgment and post-judgment interest, derived from the securities law violations

set forth in this Complaint;

7.      Imposing civil monetary penalties against Defendants for each of their securities

law violations, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

8.      Retaining jurisdiction over this action in order to implement and carry out the

terms of all orders and decrees that it may enter, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

9.     Granting such other relief as this Court may deem just or appropriate.

## VIII.   JURY DEMAND

The SEC demands a jury in this matter.


Dated:  September 21, 2023

Respectfully submitted,

*/s/ Melissa Armstrong*
Melissa Armstrong, Texas Bar No. 24050234
Stephen Kaiser*
100 F Street NE
Washington, DC 20549
Tel: (202) 551-4724 (Armstrong)
Fax: (202) 772-9286
armstrongme@sec.gov
*Attorneys for Plaintiff*
*U.S. Securities and Exchange Commission*

Of Counsel:
Timothy England

*Pro hac vice motion forthcoming