**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** *Plaintiff*, | § | |
| **v.** | § | **EP-23-CV-00353-KC** |
| **ARAS INVESTMENT BUSINESS GROUP S.A.P.I. DE C.V.; ARMANDO GUTIERREZ ROSAS, MARIA DE LOURDES TOLENTINO ROQUE; DIAYANIRA RENDON TREJO; EFREN NORBERTO QUIROZ GARDEA; AND LUIS RICARDO QUIROZ GARDEA,** *Defendants*. | § | |

**REPORT AND RECOMMENDATION**

Before the Court is the SEC's Motion for Remedies and Entry of Final Judgment (ECF No. 39). The Honorable District Judge Kathleen Cardone referred the motion to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b). For the reasons that follow, the Court concludes that the motion should be granted.

## I. BACKGROUND

This is a civil securities enforcement action.[1] The uncontested facts[2] establish that Defendants operated a Ponzi scheme that defrauded at least 450 U.S.-based investors of

[1] Compl. ¶ 1, ECF No. 1.

[2] *See* R. & R. at 4 ("[B]y their default, Aras and Gutierrez Rosas have admitted the SEC's well-pleaded allegations." (citing *Lindsey v. Prive Corp*., 161 F.3d 886, 893 (5th Cir. 1998), and *Nishimatsu Const. Co. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)), ECF No. 36; *see also In re Lyndon*, No. 12-00683, Adv. Pro. No. 18-90005, 2018 WL 3004588, at *1,*4 (Bankr. D. Haw. June 13, 2018) (describing SEC consent judgment entered "without admitting or denying" the complaint's allegations, but providing that, for purposes of the SEC's motion for disgorgement, prejudgment interest, and civil penalties, the defendant could not argue that he had not violated the securities laws and the complaint's allegations would be deemed true); *In re Papermaster*, No. 25-11564-CGB, Adv. No. 25-

approximately $15 million between March 2020 and November 2021.[3] During that period, Gutierrez operated the scheme through two entities: Aras Investment Business Group S.A.P.I. de C.V. ("Aras SAPI"), the Mexican company that ran the investment scheme, and its U.S. affiliate, Aras Business Group LLC ("Aras LLC"), which held the U.S. bank accounts used to receive and disburse investor funds.[4] Through these entities, Gutierrez targeted primarily native Spanish speakers in the Mexican-American community.[5] Through these entities, Gutierrez and his co-defendants targeted primarily native Spanish speakers in the Mexican American community, soliciting investors by falsely representing that their funds would be invested in U.S. real estate and Mexican mining ventures owned or operated by Aras SAPI.[6]

Defendants promised investors monthly returns of up to 10% and described the investments as "safe, reliable and highly profitable" and "low-risk financial instruments."[7] They disseminated these misrepresentations through offering documents, Spanish-language and English-language websites, social-media promotions, and communications from consultants they recruited to bring in new investors, including Efren Norberto Quiroz Gardea ("Efren") and Luis Ricardo Quiroz Gardea ("Luis") (together, the "Quiroz Brothers") and other sales agents.[8] Prospective investors were directed to Aras SAPI's websites, which described Aras

---

01067-CGB, 2026 WL 1278636, at *6 (Bankr. W.D. Tex. May 8, 2026) (distinguishing *Lyndon* on the ground that the consent judgment there expressly provided that the facts alleged in the SEC's complaint would be deemed true for purposes of determining damages).

[3] Compl. ¶¶ 1–3.

[4] *Id.* ¶ 1.

[5] *Id.*

[6] *Id.* ¶¶ 1-2, 14.

[7] *Id.* ¶ 2.

[8] *Id.* ¶¶ 2, 27, 29.

SAPI as a company that placed capital in diversified real-estate and mining portfolios and stated that investors' principal and accumulated interest would be returned at the end of the contract term.[9] In reality, Defendants did not use investor funds for any *legitimate* investment purposes.[10] None of the approximately $15 million raised from investors was invested in Mexican mining operations or in real estate for investors' benefit.[11] Of the $15 million, approximately $9 million was used to make Ponzi-style payments to earlier investors using funds from later investors.[12] Gutierrez directed that the remaining investor funds be misappropriated to buy a $2.5 million Texas mansion in Aras SAPI's name for his personal use, to wire $300,000 to a foreign bank account for his benefit, and to purchase luxury goods, including a $53,009 Harry Winston engagement ring and more than $34,000 in high-end retail merchandise.[13]

In addition, the other individual Defendants used investor funds for their own benefit.[14] Maria de Lourdes Tolentino Roque ("Tolentino"), whom Gutierrez hired to open and run the Aras LLC and its U.S. bank accounts, received approximately $1.3 million in investor funds in the form of salary payments and personal transfers.[15] Diayanira Rendon Trejo ("Rendon"), Aras LLC's bookkeeper, received approximately $188,000 in investor funds, likewise used for salary and personal expenses.[16] The Quiroz Brothers, whom Gutierrez used as promoters to solicit U.S.

---

[9] *Id.* ¶ 27.

[10] *Id.* ¶ 3.

[11] *Id.* ¶ 3.

[12] *Id.* ¶ 1, 33.

[13] *Id.* ¶ 34.

[14] *Id.* ¶ 1.

[15] *Id.* ¶¶ 22, 38, 46.

[16] *Id.* ¶¶ 9, 35, 46.

investors, supervise sales agents, and manage investor funds in their own bank accounts, received approximately $150,000 (Efren) and $15,000 (Luis) in commissions paid from investor funds.[17] As a result of the scheme, U.S. investors suffered net losses exceeding $6 million, with only a portion of their deposits returned through Ponzi-style payments.[18] The SEC brought seven claims against Defendants including: (1) unregistered offers and sales of securities against all Defendants;[19] (2) fraud in connection with the purchase or sale of securities against Aras and Gutierrez;[20] (3) aiding and abetting fraud by Tolentino, Rendon, and the Quiroz Brothers;[21] (4) fraud in the offer or sale of securities against Aras and Gutierrez;[22] (5) aiding and abetting that fraud;[23] (6) acting as unregistered broker-dealers by the Quiroz Brothers;[24] and (7) control person liability against Gutierrez.[25]

---

[17] *Id.* ¶¶ 1, 42-46.

[18] *Id.* ¶¶ 1, 33.

[19] Violation of Sections 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), (c).

[20] Violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; *see* Compl. ¶¶ 47–70.

[21] Aiding and abetting violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, pursuant to Section 20(e) of the Securities Exchange Act, 15 U.S.C. § 78t(e); *see* Compl. ¶¶ 56–57.

[22] Violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); *see* Compl. ¶¶ 47–70.

[23] Aiding and abetting violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b); *see* Compl. ¶¶ 47–70.

[24] Violation of Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a); *see* Compl. ¶¶ 47–70.

[25] Violation of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a); *see* Compl. ¶¶ 47–70.

On September 25, 2023, the Court entered consent judgments against the Quiroz Brothers, Tolentino, and Rendon.[26] Each consented to the Court's jurisdiction without admitting or denying the Complaint's allegations, and waived findings of fact and conclusions of law, as well as any right to appeal.[27] The consent judgments permanently enjoined all four from violating the federal antifraud provisions invoked in the Complaint.[28] Tolentino and the Quiroz Brothers were also enjoined from further unregistered offers or sales of securities, and the Quiroz Brothers were further enjoined from acting as unregistered broker-dealers.[29] Finally, all four were permanently barred from participating in the issuance, purchase, offer, or sale of any security, except for purchases and sales of exchange-listed securities for their own personal accounts.[30] The consent judgments also provide that Tolentino and Rendon shall pay disgorgement of ill-gotten gains, prejudgment interest, and civil penalties; the amounts are to be determined by the Court on motion of the SEC.[31] They also authorize the Court, on such a motion, to decide whether to order disgorgement or civil penalties against the Quiroz Brothers and, if so, in what amounts.[32] All four consent judgments specify that prejudgment interest will

[26] Defendants consented to the Court's jurisdiction over them and the subject matter of this action; consented to entry of their judgments without admitting or denying the allegations of the Complaint (except as to jurisdiction); waived findings of fact and conclusions of law; and waived any right to appeal from their judgments. J. as to Def. Efren at 1, ECF No. 10; *see also* J. as to Def. Rendon at 1, ECF No. 7; J. as to Def. Luis at 1, ECF No. 8; J. as to Def. Tolentino at 1, ECF No. 9.

[27] *E.g.,* J. as to Def. Tolentino at 1.

[28] *E.g., id.* at 1-3.

[29] *E.g., id.* at 3-4.

[30] *E.g., id.* at 4.

[31] *E.g., id.* at 5.

[32] *E.g., id.* at 5-6.

be calculated from the date of the violation using the IRS underpayment rate and that, solely for purposes of the SEC's motion for disgorgement and civil penalties, the allegations of the Complaint will be accepted as true.[33]

On April 21, 2025, the SEC moved for default judgment as to liability against Aras SAPI and Gutierrez.[34,35] On October 17, 2025, the Court issued a Report and Recommendation advising that the motion be granted, and on November 5, 2025, Judge Cardone adopted that recommendation in full and entered default judgment on all claims against Aras SAPI and Gutierrez.[36,37] The Court deferred remedies and ordered the SEC to file a motion for damages.[38] On January 9, 2026, the SEC filed this Motion for Remedies and Entry of Final Judgment.[39] No Defendant responded. The matter is now ripe for a final determination of remedies.

## II. DISCUSSION

A default judgment is a judgment on the merits that establishes liability but not the amount of damages. *United States v. Shipco Gen., Inc.,* 814 F.2d 1011, 1014 (5th Cir. 1987). By

---

[33] *E.g.,* J. as to Def. Tolentino at 5.

[34] Pl.'s Mot. for Default J. as to Liab. at 1, ECF No. 31.

[35] Aras SAPI and Gutierrez failed to appear in this action. Gutierrez went into hiding in the fall of 2021 when Aras SAPI stopped making payments to investors and Mexican authorities began enforcement proceedings against him. The SEC attempted unsuccessfully to serve Aras and Gutierrez through traditional means and later secured entries of default against them under the Hague Service Convention Article 15, Nov. 15, 1965, 20 U.S.T. 361, with due process satisfied by widespread media coverage in the United States and Mexico. Neither Aras SAPI nor Gutierrez has appeared or responded in this action. *See* Report & Recommendation at 2–6 (detailing the SEC's efforts at service, media coverage, and the entries of default judgment against Aras and Gutierrez).

[36] R. & R. at 1.

[37] Order Adopting R. & R. at 1–2.

[38] *Id.* at 2.

[39] Pl.'s Mot. for Remedies & Entry of Final J. at 1.

defaulting, Aras and Gutierrez are deemed to have admitted all well-pleaded allegations in the SEC's Complaint that form the basis of the SEC's claims against them. *Admin. Comm. of the Am. Basketball Ass'n Players' Ret. Plan v. Jones*, No. 5:16-CV-031-DAE, 2016 WL 8905038, at *4 (W.D. Tex. Sept. 7, 2016) ("[U]nder standard law, all well-pleaded allegations in plaintiff's original complaint that form the basis of plaintiff's claims against defendant are deemed to have been admitted by defendant."); R. & R. at 4. The Court has already entered default judgment as to liability against these Defendants; this Report and Recommendation addresses only the appropriate remedies.[40] Order Adopting R. & R. at 1–2.

The Court found Aras SAPI and Gutierrez liable on all claims through default judgment. Under their consent judgments, Tolentino, Rendon, and the Quiroz Brothers are precluded from arguing that they did not violate the securities laws as alleged in the Complaint. Order Adopting R. & R. at 1–2; *e.g.*, J. as to Def. Rendon at 4. Because liability and injunctive relief have already been resolved by consent judgments for Tolentino, Rendon, and the Quiroz Brothers, the only remaining questions as to them concern the amounts of monetary relief. *E.g.,* J. as to Def. Tolentino at 5.

No hearing is necessary to resolve the questions of monetary relief.[41] The consent judgments expressly authorize the Court to determine disgorgement and civil penalties "on the

---

[40] The SEC's Complaint seeks disgorgement, prejudgment interest, civil penalties, and permanent injunctive relief against Aras SAPI and Gutierrez, and the remedies now requested fall within that demand. *See* Compl. at ¶¶ 20–22; Pl.'s Mot. for Remedies & Entry of Final J. at 1–2; Fed. R. Civ. P. 54(c).

[41] Although unliquidated damages are generally proven at a hearing, a hearing is unnecessary where the amount can be determined by straightforward mathematical calculations based on detailed affidavits. *Cf. James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993). The Federal Rules of Civil Procedure confirm that the decision whether to conduct a hearing is discretionary: "The court *may* conduct hearings . . . when, to enter or effectuate a judgment, it needs to . . . determine the amount of damages." Fed. R. Civ. P. 55(b)(2) (emphasis added).

basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment." *See, e.g.*, J. as to Def. Diayanira Rendon Trejo at 4. The SEC has submitted the declaration of Matthew Reisig ("Reisig"), a certified public accountant in the SEC's Division of Enforcement, who calculated each Defendant's ill-gotten gains based on his review of bank records, deposition testimony, and financial documents produced in discovery. Declaration of Matthew Reisig ¶¶ 2–5, ECF No. 39-1. Reisig's declaration provides detailed calculations of disgorgement and prejudgment interest and explains the basis for joint and several liability. *Id.* ¶¶ 4–11. The SEC has also submitted bank records, deposition transcripts, and exhibits supporting Reisig's calculations. App. A-01–A-17, ECF Nos. 30-2–39-18. Taken together, these written submissions provide an adequate evidentiary basis to determine all requested remedies without a hearing. Courts in this district routinely order remedies on similar written submissions in both default-judgment and consent-judgment cases. *E.g., SEC v. Farias*, No. SA-20-CV-00885-XR, 2022 WL 3031082, at *6 (W.D. Tex. Aug. 1, 2022). Accordingly, the Court resolves the SEC's motion on the written record.

The SEC asks the Court to order disgorgement and prejudgment interest against all Defendants, impose a civil penalty against Gutierrez, and permanently enjoin Gutierrez and Aras SAPI from further violations of the federal securities laws and from participating in securities transactions. Pl.'s Mot. for Remedies & Entry of Final J. at 7–12. The specific amounts and relief are addressed in turn below.

**A. Disgorgement**

Disgorgement is an equitable remedy that forces a wrongdoer to surrender ill-gotten gains so he does not profit from his violations. *Liu v. SEC*, 591 U.S. 71, 82–83 (2020); *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007)). Because disgorgement is remedial rather than punitive, it is limited to the wrongdoer's net profits and must be awarded for the benefit of victims; any further sum would constitute a penalty. *Liu*, 591 U.S. at 91-92.

"[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation." *Allstate,* 501 F.3d at 413. The SEC bears the initial burden of showing that its disgorgement figure reasonably approximates the amount of unjust enrichment; the burden then shifts to the defendant to show that the figure is not reasonable. *SEC v. Faulkner*, No. 3:16-CV-1735-D, 2021 WL 75551, at *3 (N.D. Tex. Jan. 8, 2021). Under Section 21(d) of the Securities Exchange Act of 1934, codified at 15 U.S.C. §§ 78u(d)(3), (d)(5), and (d)(7), courts may award equitable relief such as disgorgement, but they must deduct legitimate business expenses before ordering disgorgement. *See Liu*, 591 U.S. at 90–91. An exception applies, however, when a business's profits are wholly the product of wrongdoing, in which case no deduction of expenses is required. *See SEC v. Voight*, No. CV H-15-2218, 2021 WL 5181062, at *8 (S.D. Tex. June 28, 2021) (imposing disgorgement for money received in the course of an offering fraud with no deduction for legitimate expenses), *aff'd*, No. 21-20511, 2023 WL 1778178 (5th Cir. Feb. 6, 2023). Any risk of uncertainty in calculating disgorgement falls on the wrongdoer whose illegal conduct created that uncertainty. *See Faulkner*, 2021 WL 75551, at *3. Under *Liu*, courts retain flexibility to impose joint and several liability against individuals or partners engaged in concerted wrongdoing. *Liu*, 591 U.S. at 82–83, 90–91 (citing *SEC v. World Tree Fin., LLC*, 43 F.4th 448, 467 n.15 (5th Cir. 2022)).

In his investigation for calculating disgorgement, Reisig traced the flow of investor funds and calculated each Defendant's ill-gotten gains by reviewing bank records for eleven accounts associated with the Defendants from March 2020 through August 2022, together with deposition transcripts and investigative reports. *See* Reisig Decl. ¶¶ 2–5. Tracing investor deposits through bank accounts and identifying personal receipts and expenditures is an appropriate way to reasonably approximate unjust enrichment, and courts have upheld disgorgement awards based on similar forensic accounting of disbursements from fraudulent entities. *See SEC v. Hallam*, 42 F.4th 316, 319–20 (5th Cir. 2022).

Reisig determined that investors deposited a total of $15,343,955 into the Aras LLC bank accounts during the relevant period, including approximately $14,836,355 from U.S. investors. *See* Reisig Decl. ¶ 6; App. A-1. The remaining $507,600 came from other sources but were also derived from investor funds or represented returns of investor funds.[42] The entire $15,343,955 dollars therefore represents investor money. Reisig Decl. ¶ 6. This figure provides the starting point for the Court's disgorgement analysis.

From the Aras LLC accounts, Aras and Gutierrez used approximately $382,039 of investor funds for personal expenses, including a $300,000 wire transfer to Vector Casa de Bolsa, S.A., a securities brokerage in Mexico. Reisig Decl. ¶ 7; App. A-6. Tolentino testified that she also made purchases totaling approximately $66,707 dollars for Aras' and Gutierrez's benefit, including $53,009 dollars paid to Harry Winston, Inc. for an engagement ring. Reisig Decl. ¶ 7; App. A-5. These transactions yielded total ill-gotten gains to Aras and Gutierrez of $448,746. Reisig Decl. ¶ 7; App. A-6.

[42] The $507,600 in other deposits consisted of funds from Mexican investors via Aras SAPI, refunds from Prime Investments LLC for real estate purchased with investor funds, a refund from the law firm Smith and Collins, and interest on investor deposits. *See* Reisig Decl. ¶ 6; App. A-2, A-3, A-4.

The SEC asks that the $448,746 dollar disgorgement amount be imposed jointly and severally on Aras SAPI and Gutierrez. *See* Pl.'s Mot. for Remedies & Entry of Final J. at 10–11. The Court finds this request is appropriate. Gutierrez founded and controlled Aras SAPI, and the two acted in concert throughout the fraudulent scheme. *See* Compl. ¶¶ 1, 14, 20, 26. The $448,746 amount represents money and property that cannot be meaningfully apportioned between Gutierrez personally and Aras SAPI as an entity. Reisig Decl. ¶ 7. The $2.5 million mansion, for example, was purchased in Aras SAPI's name but for Gutierrez's personal use. Compl. ¶ 34. Likewise, the $300,000 wire transfer, the $53,009 engagement ring, and more than $34,000 in luxury goods from high-end retailers were paid from Aras LLC funds at Gutierrez's direction, with no evidence of what became of many of these items. *Id.* Aras SAPI functioned solely as Gutierrez's vehicle: he exercised complete control over the entity, made all material decisions, directed all uses of investor funds, and personally benefited from the fraud. Compl. ¶¶ 26–27, 34–37. Joint and several liability for the entire $448,746 therefore prevents either defendant from shifting responsibility to the other and ensures full recovery of ill-gotten gains. *See SEC v. Halek*, 537 F. App'x 576, 580-81 (5th Cir. 2013) (affirming joint and several disgorgement where defendant and entity acted in concert).

Reisig traced investor funds into Tolentino's personal bank accounts and found that approximately $123,445 in investor funds were deposited directly into her accounts and approximately $923,736 were transferred from the Aras LLC accounts to her, both on a net basis. Reisig Decl. ¶ 8. As the sole signatory on the primary Aras LLC account (a Wells Fargo account ending in -1183), Tolentino made personal purchases and cash withdrawals totaling approximately $269,924 from that account. *Id.* Taken together, these deposits, transfers, and withdrawals gave Tolentino gross receipts of $1,317,105. *Id.*; App. A-9. From this subtotal,

Reisig deducted $56,930 for purchases not made for Tolentino's benefit, $39,938 transferred to the Quiroz Brothers, $55,306 in purchases Tolentino made for Gutierrez (already counted in his disgorgement amount), $27,750 from the sale of Tolentino's truck in bankruptcy to satisfy investor claims, and $162,368 from the sale of Tolentino's home in bankruptcy to satisfy investor claims. Reisig Decl. ¶ 8; App. A-7, A-8, A-9. These deductions result in net profits of $974,813, a reasonable approximation that accounts for transfers to other defendants, avoids double counting, and deducts amounts already recovered for investors' benefit. Reisig Decl. ¶ 8; App. A-7, A-8. The $974,813 represents investor funds Tolentino personally received and used for her own benefit, primarily as salary payments and personal transfers from the Aras LLC accounts. Reisig Decl. ¶ 8.

Next, Reisig traced investor funds from the Aras LLC accounts into Rendon's personal bank accounts and determined that she received a little more than $313,000 in investor money.[43] Reisig Decl. 39-1 ¶ 9. From this amount, he deducted funds that Rendon returned to investors and a small reimbursement for office expenses, resulting in net profits of $187,829.[44] Reisig Decl. ¶ 9; App. A-10. This calculation is reasonable and reflects that, as Aras LLC's bookkeeper, Rendon had access to investor funds and used them primarily for salary and personal expenses. The $187,829 figure reflects only the net amount Rendon retained after returning money to investors and receiving reimbursement for office expenses.

---

[43] This total consists of approximately $283,236 in investor funds transferred from Aras LLC accounts into Rendon's personal bank accounts, $500 deposited directly by an investor, and a $30,000 check sourced from investor funds. Reisig Decl. ¶ 9; App. A-10.

[44] Reisig deducted $123,351 that Rendon returned to investors and $2,556 that Rendon received from Aras LLC on September 29, 2021, marked as reimbursement for office expenses. Reisig Decl. ¶ 9; App. A-10.

Regarding Efren and Luis Quiroz, first, the Court must determine whether disgorgement is appropriate for them. Unlike the consent judgments for Tolentino and Rendon, which provide that those defendants 'shall pay' disgorgement, the Quiroz brothers' consent judgments provide that the Court 'shall determine whether it is appropriate to order disgorgement and, if so, in what amounts. *E.g.*, J. as to Def. Luis at 5-6. The Court finds that disgorgement is appropriate for both brothers. They handled approximately $500,000 in investor funds through their personal bank accounts, made Ponzi payments to earlier investors, and personally retained $243,270 (Efren) and $108,270 (Luis) in ill-gotten gains. Reisig Decl. ¶¶ 10–11. They acted as promoters who solicited U.S. investors and managed sales agents, playing a material role in the fraudulent scheme. Compl. ¶ 1. Disgorgement is necessary to prevent them from being unjustly enriched by their wrongdoing and to provide restitution to victims. *See Hallam*, 42 F.4th at 328.

The Quiroz brothers handled investor funds through two joint Wells Fargo accounts. Reisig Decl. ¶ 10. Reisig determined that approximately $161,158 in investor funds was transferred from the Aras LLC accounts into these joint accounts, on a net basis. *Id.*; App. A-11. From this amount, he deducted approximately $67,888 that they transferred back to the Aras LLC accounts, resulting in a net benefit of $93,270 from the joint accounts. *Id.* Reisig could not determine which brother benefited from the $93,270 because the funds were commingled in jointly controlled accounts, making individual attribution impossible on this record. *Id.*

In addition to the joint-account funds, Efren testified that he received $150,000 in commissions for recruiting Aras SAPI investors, and Luis testified that he received between $10,000 and $15,000 in commissions for recruiting U.S. investors.[45] Reisig Decl. ¶ 11; App.

[45] Luis Quiroz testified that, as a consultant, he earned "maybe $10,000 or $15,000 at the most" in commissions from U.S. investors. App. A-13 at 89:22-90:3. Although this testimony gives a range rather than a precise figure, the Court finds that the SEC's use of $15,000 is a reasonable approximation of his ill-gotten gains because it comes from his own sworn testimony and represents the upper bound of the

A-12, A-13. Reisig used $15,000 as the commission amount for Luis. Reisig Decl. ¶ 11 n.1. Adding these commission amounts to each brother's share of the joint-account benefit yields total net profits of $243,270 for Efren and $108,270 for Luis. Reisig Decl. ¶ 11. These amounts are supported by bank records and the brothers' own sworn testimony and reasonably approximate their unjust enrichment from their roles as promoters and handlers of investor funds.

The SEC also requests that $93,270 of the Quiroz brothers' total disgorgement be imposed on a joint and several basis. Pl.'s Mot. for Remedies & Entry of Final J. at 11. The Court finds this request is appropriate. Because the funds were commingled in jointly controlled accounts, individual attribution is impossible, and the burden of that uncertainty falls on the wrongdoers whose joint conduct created it. The remaining disgorgement—$150,000 for Efren and $15,000 for Luis—represents individual commission payments each brother admitted receiving and is assessed individually.

Finally, Reisig confirmed that all disgorgement amounts—totaling $1,869,658—constitute harm to investors. Reisig Decl. ¶ 12. He calculated that approximately $6.6 million of the roughly $15.2 million investors deposited was lost, while approximately $8.6 million was paid back to investors in a Ponzi-like fashion. *Id.* ¶¶ 14–15; App. A-16. The Court finds that the SEC has met its burden of showing that the disgorgement figures reasonably approximate each Defendant's unjust enrichment. Reisig's methodology is sound. His calculations are supported by bank records and sworn testimony, and his deductions account for transfers between defendants and amounts already recovered for victims through bankruptcy proceedings. Reisig Decl. ¶¶ 4–11; App. A-1–A-16. The burden therefore shifts to Defendants to show that these

---

range he provided. Luis Quiroz has had every opportunity to dispute that amount, argue that his commissions were closer to $10,000, or submit evidence showing a more precise figure, but he has not done so. On this record, the SEC has met its burden of providing a reasonable approximation, and any remaining uncertainty falls on the wrongdoer whose conduct created that uncertainty.

figures are unreasonable; none have responded, and none has met this burden. *See Faulkner*, 2021 WL 75551, at *4 (concluding that defendants failed to carry their burden because they did not respond to SEC's motion for remedies). The total disgorgement of $1,869,658 represents funds Defendants personally received and retained from the scheme. More than 450 U.S. investors lost over $6.6 million; these defendants must repay the funds they obtained through fraud.

Based on the analysis above, the Court orders disgorgement in the following amounts:

| **Defendant** | **Individual Disgorgement** | **Joint & Several Disgorgement** | **Total Disgorgement**[46] |
|---|---|---|---|
| Aras & Gutierrez | — | $448,746 | $448,746 |
| Tolentino | $974,813 | — | $974,813 |
| Rendon | $187,829 | — | $187,829 |
| Efren Quiroz | $150,000 | $93,270 | $243,270 |
| Luis Quiroz | $15,000 | $93,270 | $108,270 |
| **TOTAL** | | | **$1,869,658** |

**B. Prejudgment Interest**

Defendants retained investor funds from March 2020 through November 2021, making prejudgment interest appropriate here. Courts may award prejudgment interest on disgorgement to prevent wrongdoers from benefiting from what is, in effect, an interest-free loan resulting from their illegal activity. *SEC v. Milles*, No. SA-20-CV-00885-XR, 2022 WL 206808, at *7 (W.D. Tex. Jan. 24, 2022). Where a wrongdoer enjoyed access to funds over a prolonged period as a result of his wrongdoing, ordering payment of prejudgment interest reflects the equitable purpose of disgorgement. *Faulkner*, 2021 WL 75551, at *9. The IRS underpayment of federal income tax rate as promulgated in 26 U.S.C. § 6621(a)(2) is the appropriate measure for calculating prejudgment interest in SEC enforcement actions because it "reflects what it would

[46] The $93,270 joint and several amount appears in both Efren's and Luis's rows but is counted only once in the total. Both brothers are jointly and severally liable for that amount.

have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *Id.* at *10 (internal quotation marks and citation omitted).

Prejudgment interest is warranted for all Defendants because they had prolonged access to investor funds from March 2020 through November 2021. Compl. ¶¶ 1, 14, 21-37. Reisig calculated prejudgment interest for each Defendant from November 1, 2021, the last date an investor deposited funds into both Aras accounts, through October 31, 2025.[47] Reisig Decl. ¶ 16; App. A-17. He applied the IRS underpayment rate under § 6621(a)(2), compounded quarterly as required by 17 C.F.R. § 201.600.[48] *Id.* This methodology is appropriate and widely used in SEC enforcement actions. *See Faulkner*, 2021 WL 75551, at *10.

Prejudgment interest is appropriate against Defendants' disgorgement amounts. Aras SAPI and Gutierrez owe $129,614 of prejudgment interest on their $448,746 disgorgement amount, imposed jointly and severally consistent with the underlying disgorgement. *Halek*, 537 F. App'x at 579 (affirming joint and several prejudgment interest); *SEC v. Arcturus Corp.*, No. 3:13-CV-4861, 2025 WL 333787, at *7 (N.D. Tex. Jan. 28, 2025) (awarding prejudgment interest jointly and severally). Tolentino owes $281,559 of prejudgment interest on her $974,813 disgorgement amount, and Rendon owes $54,251 of prejudgment interest on her $187,829

---

[47] The consent judgments provide that prejudgment interest shall be calculated "from the date of the violation" using the IRS underpayment rate. *E.g.*, J. as to Efren Norberto Quiroz Gardea. Reisig used November 1, 2021, the last date an investor deposited funds, as the start date for all Defendants, and October 31, 2025, as the end date because that was the date through which Reisig performed his calculations in connection with the SEC's motion for remedies. Reisig Decl. ¶ 16. This approach is reasonable and conservative because it uses the final date of the violation period rather than an earlier date when Defendants first began receiving investor funds in March 2020. Moreover, prejudgment interest continues to accrue after October 31, 2025, until entry of final judgment.

[48] The calculation applies quarterly IRS underpayment rates ranging from 3% (Q1 2022) to 8% (multiple quarters in 2023–2024). App. A-17 at 1.

disgorgement amount. App. A-17 at 2-3. Efren Quiroz owes $70,265 of prejudgment interest on his $243,270 disgorgement amount, and Luis Quiroz owes $31,272 of prejudgment interest on his $108,270 disgorgement amount. Reisig Decl. ¶ 16; App. A-17 at 4-5. Of those amounts, $26,940 of prejudgment interest is imposed jointly and severally on both brothers, attributable to the commingled $93,270; the remainder is assessed individually. *Id.*

The Court finds that Reisig's calculations are accurate, reasonable, and supported by the detailed quarterly computations in Appendix A-17. No Defendant has challenged these calculations or offered any basis to reduce the amounts. Prejudgment interest shall continue to accrue from November 1, 2025, at the applicable IRS underpayment rate under § 6621(a)(2), compounded quarterly under 17 C.F.R. § 201.600, until the judgment is satisfied.

| **Defendant** | **Prejudgment Interest** | **Joint & Several** |
|---|---|---|
| Aras & Gutierrez | $129,614 | Jointly and severally |
| Tolentino | $281,559 | — |
| Rendon | $54,251 | — |
| Efren Quiroz | $70,265 | $26,940 joint and severally with Luis |
| Luis Quiroz | $31,272 | $26,940 joint and severally with Efren |

**C. Civil Penalties**

Both the Securities Act and the Exchange Act authorize courts to impose civil penalties. 15 U.S.C. §§ 77t(d), 78u(d)(3). These penalties punish violators and deter future violations of the securities laws, which is necessary because "[w]ithout civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains." *Faulkner*, 2021 WL 75551, at *10. Both statutes establish a three-tier penalty structure with increasing maximum amounts based on the severity of the violation. *Id.* (citing 15 U.S.C. §§ 77t(d)(1), 78u(d)(3)(A)). First-tier penalties may be imposed for any violation. *Id.* Second-tier penalties are warranted when violations involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* Third-tier penalties are authorized when such violations also "directly or

indirectly result in substantial losses or create a significant risk of substantial losses to other persons." *Id.*; *see also* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

For violations during the relevant period, the maximum third-tier civil penalty for an individual is the greater of (1) the gross pecuniary gain to the defendant or (2) $230,464[49] per violation. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1001. Although the tier determines the maximum penalty amount, the actual amount imposed is left to the court's discretion. *Faulkner*, 2021 WL 75551, at *10 (citing *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005)). The securities statutes do not specify how to set the penalty within the applicable tier, but courts typically consider the following non-exclusive factors: (1) the egregiousness of the defendant's conduct; (2) the degree of scienter; (3) whether the conduct created substantial losses or the risk of substantial losses to others; (4) whether the conduct was isolated or recurrent; and (5) whether the penalty should be reduced given the defendant's current and future financial condition. *Id.* at *10–*11. These factors are guides, not rules: the civil-penalty framework is discretionary, and the particular facts of each case determine the appropriate penalty. *Id.* at *11 (citing *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007)).

The SEC requests a third-tier civil penalty of $448,746 against Gutierrez, equal to his gross pecuniary gain,[50] rather than penalties calculated on a per-violation basis. Pl.'s Mot. for Remedies & Entry of Final J. at 16-20. The SEC seeks civil penalties only against Gutierrez, but

[49] The underlying statutes specify that the maximum third-tier penalty is the greater of the defendant's gross pecuniary gain or a fixed "per violation" dollar amount. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). Congress has directed agencies to adjust those fixed dollar amounts for inflation, and the Commission does so by regulation and annual notice. *See* 17 C.F.R. § 201.1001. The Commission's most recent inflation-adjustment table for the relevant period sets the third-tier per-violation maximum for a natural person at $230,464. The Court relies on that table to identify the current inflation-adjusted cap.

[50] The Court uses the same $448,746 figure for disgorgement and for gross pecuniary gain because it represents the total investor funds Gutierrez and Aras SAPI personally obtained from the fraud, with no evidence of legitimate offsetting expenses.

not against Aras SAPI or the other individual defendants. *Id.* That focus is appropriate given that Gutierrez was the founder, CEO, and primary architect of the scheme, exercised complete control over Aras SAPI, and directed the actions of the other defendants. Compl. ¶¶ 1, 14, 20, 26; R. & R. at 12-15.

Although Gutierrez's conduct involved hundreds of separate fraudulent solicitations over twenty months, the Court has discretion to impose a single aggregate penalty rather than attempt to quantify each discrete violation. *See SEC v. Helms*, No. 3:12-CV-1221-D, 2015 WL 5010298, at *19 (N.D. Tex. Aug. 24, 2015). Because the statutory maximum is $230,464 per violation, the aggregate maximum civil penalty the Court could impose based on Gutierrez's numerous violations would far exceed $448,746; the requested single penalty is therefore well within the Court's authority. A penalty equal to Gutierrez's ill-gotten gains serves the dual purposes of punishment and deterrence by ensuring that he faces financial consequences beyond merely returning what he took. *See Faulkner*, 2021 WL 75551, at *10.

The record supports imposing third-tier penalties. *See generally* Order Adopting R. & R.; *see also Voight*, 2021 WL 5181062, at *15 (imposing third-tier penalty based on complaint's allegations "which must be accepted as true"). Gutierrez, through Aras SAPI, fraudulently solicited at least 450 U.S. investors to invest approximately $15 million by misrepresenting that their funds would be used for real-estate and Mexican mining investments. Compl. ¶¶ 1, 23, 26-27, 32; R & R at 12-15. In reality, he spent no money on U.S. real estate or Mexican mining operations and instead used investor funds to make Ponzi payments and fund his own luxury expenses. Compl. ¶¶ 32-34; R & R at 14. That is fraud and deceit resulting in substantial losses — precisely the conduct the third-tier penalty is designed to punish. 15 U.S.C. §§ 77t(d), 78u(d)(3).

Gutierrez's conduct was egregious. He was the primary architect, manager, and beneficiary of a $15 million Ponzi scheme that operated for approximately twenty months and defrauded at least 450 U.S. investors. Compl. ¶ 1; R & R at 12-15. He founded and controlled Aras SAPI, created and disseminated fraudulent offering documents promising investors monthly returns of up to 10%, and marketed the investment contracts through websites, social media, and a network of recruited consultants. Compl. ¶¶ 26-28; R & R at 12-13. Gutierrez repeatedly lied to investors about how their money would be used, promising that funds would go to real-estate and Mexican mining ventures when he knew no such investments would be made. Compl. ¶¶ 27, 32; R & R at 13-14. He directed Tolentino, Rendon, and the Quiroz brothers to make Ponzi payments to earlier investors using new investor deposits, while simultaneously instructing them to send him investor funds and purchase luxury items on his behalf. Compl. ¶¶ 33-34; R & R at 14. These luxury purchases included a $2.5 million mansion for his personal use, a $53,009 Harry Winston engagement ring, and over $34,000 in goods from high-end retailers such as Hermes, Louis Vuitton, and Tom Ford. Compl. ¶ 34.

Gutierrez acted with a high degree of scienter. He exercised complete control over Aras SAPI, directed all material aspects of the fraudulent scheme, and maintained full visibility into how investor funds were spent. Compl. ¶¶ 35-37; R & R at 15. Gutierrez directed Tolentino and other employees to make specific expenditures of investor funds and received bank statements reflecting their misuse. Compl. ¶¶ 34-37; R & R at 14-15. His decision to go into hiding in the fall of 2021, when Aras SAPI stopped making payments and Mexican authorities began pursuing enforcement proceedings, confirms that his violations were intentional. Compl. ¶¶ 14-15, 37; R & R at 5, 15. No evidence suggests that Gutierrez was misled or mistaken; his central role in

designing the offering terms, controlling the accounts, and directing the use of funds shows deliberate, knowing fraud. *Voight*, 2021 WL 5181062, at *16.

Gutierrez's fraud directly resulted in substantial losses to investors: approximately $6.6 million of the $15.2 million that U.S. investors deposited was lost. Reisig Decl. ¶¶ 14-15. Courts have treated significantly smaller losses as substantial. *See SEC v. Jaitley*, No. 1:21-CV-0832-DAE, 2024 WL 5088389, at *4 (W.D. Tex. Dec. 12, 2024) (losses of $800,000 in principal were substantial); *see also Voight*, 2021 WL 5181062, at *16 (losses of $22 million from $114 million raised were substantial). Even if some portion of investor funds might be recovered through disgorgement or other means, the scheme itself created a substantial risk of loss from its inception. Gutierrez solicited millions of dollars that he promised to invest in lucrative real-estate and mining opportunities, despite knowing that no such investments would be made, that investor funds would be used for Ponzi payments and personal expenses, and that the only way to pay the promised returns was through new investor deposits. Compl. ¶¶ 32-33; R & R at 14. The scheme guaranteed substantial losses from inception. *See Voight*, 2021 WL 5181062, at *17.

Gutierrez's fraudulent conduct was recurrent in both duration and scope. He operated the Ponzi scheme for approximately twenty months, defrauding at least 450 U.S. investors across multiple states through hundreds of fraudulent solicitations. Compl. ¶ 1; Reisig Decl. ¶ 6. His leadership role throughout—continuously recruiting new investors, directing others' sales efforts, and overseeing the flow of investor funds—confirms that the misconduct was sustained and deliberate, not episodic or inadvertent. Courts have found similar conduct to be recurrent. *See, e.g., Jaitley*, 2024 WL 5088389, at *4; *SEC v. Myers*, No. 4:15-CV-00300, 2018 WL 11353113,

at *9 (E.D. Tex. July 25, 2018); *SEC v. Sethi Petrol., LLC*, No. 4:15-CV-00338, 2017 WL 3386047, at *4 (E.D. Tex. Aug. 7, 2017); *Voight*, 2021 WL 5181062, at *17.

A defendant seeking a reduced penalty based on inability to pay bears the burden of establishing his financial condition by a preponderance of the evidence. *SEC v. Sample*, No. 3:14-CV-1218-B, 2017 WL 5569873, at *4 (N.D. Tex. Nov. 20, 2017). Gutierrez has defaulted and has provided no information about his current or future financial condition. Clerk's Entry of Default; Order Adopting R. & R. The Court therefore has no basis to reduce the penalty on this ground.[51] *See SEC v. Esposito*, 260 F. Supp. 3d 79, 93 (D. Mass. 2017) (imposing third-tier penalty on defendant who "has not accepted responsibility for its actions−having defaulted and failed to appear before this Court"); *SEC v. Knox*, No. 18-12058-RGS, 2022 WL 1912877, at *3 (D. Mass. June 3, 2022) (imposing third-tier penalty on defendants who "neither cooperated nor admitted wrongdoing").

The first four factors weigh heavily in favor of a substantial penalty; the fifth is neutral at best. Gutierrez intentionally and repeatedly deceived hundreds of victims, caused millions of dollars in losses, went into hiding to evade authorities,[52] and has taken no responsibility for his actions. A civil penalty equal to his ill-gotten gains, imposed in addition to disgorgement, is

[51] Moreover, even if Gutierrez had submitted credible evidence of his inability to pay, that factor would be significantly outweighed by the other four factors, all of which weigh heavily in favor of a substantial penalty. *See Myers*, 2018 WL 11353113, at *9 ("Defendants' inability to pay is significantly outweighed by the other determinative factors in favor of greater civil penalties."); *Voight*, 2021 WL 5181062, at *17 (financial condition factor "weighs slightly in favor of a reduced penalty" but other factors support substantial penalty).

[52] Although not formally part of the five-factor framework, Gutierrez's refusal to accept responsibility for his wrongdoing also supports a substantial penalty. Gutierrez went into hiding when the fraud was uncovered in 2021 and has not appeared in this action or answered the SEC's Complaint. Compl. ¶¶ 14–15, 37; Pl.'s Mot. for Default J. as to Liab. at 2; R. & R. at 5. His continued evasion of Mexican authorities has caused substantial prejudice to the SEC. ECF No. 36 at 5. A defendant who flees rather than answers forfeits any claim to leniency. *See Esposito*, 260 F. Supp. 3d at 93; *Knox*, 2022 WL 1912877, at *3.

warranted to punish his conduct and deter others. The Court therefore concludes that a third-tier civil penalty of $448,746 against Gutierrez, equal to his gross pecuniary gain from fraud, is appropriate.

**D. Permanent Injunction (Conduct-Based)**

Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b), and Section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d), authorize the SEC to seek permanent injunctions when a defendant "is engaged or is about to engage" in violations of the securities laws.[53] *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981). To obtain a permanent injunction, the SEC must satisfy the four-factor test set forth in *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008): (1) success on the merits, (2) likelihood of irreparable harm absent an injunction, (3) the balance of equities favors the SEC, and (4) the injunction is in the public interest. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (courts exercise equitable authority "in a manner consistent with traditional principles of equity.").

All four *Winter* factors support permanent injunctive relief against Gutierrez and Aras SAPI. The Court has entered default judgment against both, finding them liable for violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Order Adopting R. & R. at 1–2. Default judgment constitutes success on the merits. *See Chevron Intell. Prop., L.L.C. v. Allen*, No. 08-CV-98, 2009 WL 2596610, at *3

[53] The permanent injunctions against violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Rule 10b-5, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] reflected in Sections I and II of the Plaintiff's Proposed Final Judgment apply to all Defendants. As to Gutierrez and Aras SAPI, these injunctions are imposed as relief ordered herein. As to Tolentino, Rendon, and the Quiroz Brothers, the antifraud injunctions were already entered through their respective consent judgments and are carried forward and incorporated into the Final Judgment through Section XIV thereof. *E.g.,* J. as to Def. Tolentino at 2-3. No new injunctive relief against the consent defendants is recommended here; their monetary obligations are the only matters newly determined by this R. and R.

(N.D. Tex. Aug. 24, 2009); *T-Mobile USA Inc. v. Shazia & Noushad Corp.*, No. 08-CV-341, 2009 WL 2003369, at *4 (N.D. Tex. July 10, 2009). This factor supports an injunction.

The likelihood of irreparable harm is demonstrated by showing a reasonable likelihood that the defendant will commit future violations. *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009). Courts assess this by considering the egregiousness of the defendant's conduct, whether the violations were isolated or recurrent, the degree of scienter, the sincerity of recognition of wrongdoing, and the likelihood of future opportunities for violations. *Id.*

All five factors point toward future violations by Gutierrez and Aras SAPI. As discussed above, Gutierrez designed and executed a $15 million Ponzi scheme over twenty months, acted with full knowledge of its falsity, defrauded at least 450 investors across multiple states, and has shown no remorse—going into hiding rather than answering for his conduct. *See Helms,* 2015 WL 5010298, at *18; *Farias*, 2022 WL 3031082, at *6–7; *Jaitley,* 2024 WL 5088389, at *4; *SEC v. Stack*, No. 1:21-CV-51-LY, 2023 WL 1325495, at *7 (W.D. Tex. Jan. 31, 2023). Gutierrez retains access to the same tools he used to solicit investors—websites, offering documents, and electronic communications—and there is no evidence he has abandoned his fraudulent methods. Compl. ¶¶ 25, 27; s*ee Farias*, 2022 WL 3031082, at *6. Taken together, these facts establish a reasonable likelihood of future violations and constitute irreparable harm absent injunctive relief. *See SEC v. Guess*, No. 24-CV-172, 2025 WL 1866044, at *7 (D. Neb. July 7, 2025).

The balance of equities and the public interest both favor an injunction. Gutierrez and Aras SAPI, having violated federal securities laws and refused to appear in this action, have forfeited any equitable interest that might weigh against relief. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972). "Seeking to protect the interests of defrauded investors and uphold federal securities law is in the public interest." *SEC v. Barton*, 135 F.4th 219, 227

(5th Cir. 2024). When a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, "it almost always will be the case that the public interest will favor the plaintiff." *SEC v. Chappell*, 107 F.4th 114, 139 (3d Cir. 2024). Both conditions are met here.

The Court therefore concludes that Gutierrez and Aras SAPI, and their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the instant order, should be permanently restrained and enjoined from violating, directly or indirectly:

- Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c);
- Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); and
- Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**E. Conduct-Based Securities Participation Bar**

The SEC requests a conduct-based injunction permanently barring Gutierrez and Aras SAPI from participating in the issuance, purchase, offer, or sale of any security, except that Gutierrez may purchase or sell securities listed on a national securities exchange for his own personal account. Pl.'s Mot. for Remedies & Entry of Final J. at 20–22. This relief is specifically authorized by 15 U.S.C. §§ 77t(b), 78u(d)(5);[54] *see also Voight*, 2021 WL 5181062, at *14; *Faulkner*, 2021 WL 75551, at *14–*16. The same facts that warrant a permanent injunction also justify a conduct-based securities-participation bar. As discussed above,

[54] The Court notes that the SEC's motion seeks a permanent anti-violation injunction and a conduct-based injunction barring Gutierrez and Aras SAPI from participating in the issuance, purchase, offer, or sale of securities, but does not request an officer-and-director bar under 15 U.S.C. §§ 77t(e) or 78u(d)(2). In light of Federal Rule of Civil Procedure 54(c), which limits default judgments to relief not different in kind from what is demanded in the pleadings, the Court confines its injunctive-relief recommendations to the forms expressly requested—the anti-violation injunctions and conduct-based participation bar.

Gutierrez was the architect and controller of a large-scale Ponzi scheme who acted intentionally, repeatedly, and without remorse. He poses a continuing threat to investors if permitted to participate in securities transactions. The personal-account exception for exchange-listed securities allows him to manage his own investments without creating comparable risk to others.

The Court therefore finds that Gutierrez and Aras SAPI should be permanently enjoined from participating, directly or indirectly, including through any entity they own or control, in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction should not prevent Gutierrez from purchasing or selling securities listed on a national securities exchange for his own personal account. This bar is tailored to the conduct at issue: it targets Gutierrez's ability to solicit and handle investor funds while preserving his ability to engage in ordinary, arm's-length trading for his own account. The Court concludes that the requested remedies are authorized by statute, supported by the uncontested record, and necessary given the scope, duration, and intentional nature of Gutierrez's fraud.

## IV. CONCLUSION

For the reasons above, **IT IS RECOMMENDED** that the SEC's Motion for Remedies and Entry of Final Judgment (ECF No. 39) be **GRANTED**.

**IT IS FURTHER RECOMMENDED** that the SEC's proposed final judgment (ECF No. 39-20) be **ENTERED**.

**IT IS FINALLY RECOMMENDED** that the SEC file updated monetary figures reflecting prejudgment interest accrued through the date of final judgment.

**So ORDERED and SIGNED this 18th day of June 2026.**

**ANNE T. BERTON**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE**

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THE FOREGOING REPORT, WITHIN FOURTEEN DAYS OF SERVICE OF SAME, MAY BAR DE NOVO DETERMINATION BY THE DISTRICT JUDGE OF AN ISSUE COVERED HEREIN AND SHALL BAR APPELLATE REVIEW, EXCEPT UPON GROUNDS OF PLAIN ERROR, OF ANY UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS AS MAY BE ACCEPTED OR ADOPTED BY THE DISTRICT COURT.**